1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                          **DISTRICT OF NEVADA**
7

8    ROBYN D. BURTON,                      )
                                           )
9                    Plaintiff,            )    Case No.  2:12-cv-00303-KJD-GWF
                                           )
10   vs.                                   )    **FINDINGS AND**
                                           )    **RECOMMENDATION**
11   MICHAEL J. ASTRUE, Commissioner,      )
     Social Security Administration,       )
12                                         )
                     Defendant.            )
13   _____)

14           This case involves judicial review of administrative action by the Commissioner of Social

15   Security denying Plaintiff Robyn Burton's claim for disability benefits under Title II of the Social

16   Security Act.  Plaintiff's Complaint (#1) was filed February 24, 2012.  Defendant's Answer (#6)

17   was filed May 25, 2012, as was a certified copy of the Administrative Record (the "A.R.").  *See*

18   *Notice* (#7).   This matter has been submitted to the undersigned United States Magistrate Judge for

19   Findings and Recommendations on Burton's Motion for Remand (#12), filed on July 25, 2012;

20   Defendant's Opposition to Plaintiff's Motion to Remand (#13), filed on August 23, 2012; and

21   Plaintiff's Reply (#16), filed on September 18, 2012.

22           Plaintiff Robyn Burton seeks judicial review of the Administrative Law Judge's ("ALJ")

23   decision dated September 20, 2010.  (A.R. 18-25.)  The issue before the Court is whether the

24   Plaintiff was disabled from her alleged onset date of March 22, 2009.

25                                    **BACKGROUND**

26       **A.      Procedural History**

27           On April 4, 2009, Plaintiff protectively filed an application for a period of disability and

28   disability insurance benefits.  Plaintiff's alleged onset date of disability is March 22, 2009.  (A.R.

18.)  The agency denied Plaintiff's application initially on July 30, 2009, and upon reconsideration on September 9, 2009.  (A.R. 557-60, 64-66.)  On October 22, 2009, Plaintiff requested a hearing before an ALJ.  (A.R. 70.)  The hearing was conducted on August 26, 2010 and Plaintiff appeared and testified. (A.R. 35-48.)  A vocational expert, Jack Dymond, also testified. (A.R. 35-48.)  The ALJ issued his decision on September 20, 2010 and concluded that Plaintiff was not disabled from the alleged onset date of March 22, 2009 through the date of the decision.  (A.R. 18-25.)  Plaintiff's request for review by the Appeals Council was denied.  (A.R. 1-5.)  She then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).   This matter has been referred to the undersigned for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

### B.    Factual Background

Plaintiff Robyn Burton was born in October 1962.  Prior to March 22, 2009, she worked in "high end" jewelry sales for several jewelry stores.  (A.R. 38-40.)  Ms. Burton reported that this work required her to stand all day and carry heavy jewelry trays.  She also described the work as stressful.  (A.R. 139-143.)  Ms. Burton, who had a longstanding history of diabetes mellitus, suffered a myocardial infarction on March 22, 2009 and was admitted to Mountainview Hospital in Las Vegas, Nevada.  She underwent percutaneous transluminal coronary angioplasty by Dr. Zia Khan, and two stents were placed in her right coronary artery.  (A.R. 184.)  Ms. Burton was discharged on March 27, 2009 with instructions to follow up with Dr. Khan in 7 to 10 days.  (A.R. 183.)

Dr. Khan saw Ms. Burton on April 2, 2009.  (A.R. 251-253.)[1]  Ms. Burton complained of experiencing chest pains for three weeks.  She described the discomfort as a heavy weight like sensation.  She reported getting two attacks per week which usually came on when walking.  The chest pain was frequently associated with shortness of breath.  The episodes lasted approximately one minute and were relieved by rest.  Dr. Khan further noted that Ms. Burton was a discharge from

---

[1] The date of this visit is somewhat confusing.  The record states at the top:  "Note for Robyn Burton on 5/20/2009."  The first sentence under the heading "DATE OF LAST VISIT," however, states:  "Chief Complaint (1/3): This 46 year old female presents today 04/02/2009 for initial evaluation of cardiac symptoms."  (A.R. 251.)

Mountainview Hospital and was status post surgery.  The note states: "Since the hospital she has been doing fine with no present complaints."  (A.R. 251.)  Under "Impression," however, Dr. Khan stated: "Abnormal EKG.  Chest Discomfort and Tightness.  Chest Pain.  Myocardial Infarction (old).  Status Post PTCA.  Shortness of Breath."  Dr. Khan recommended that Ms. Burton have an echocardiogram, nuclear stress test and "MUGA."  (A.R. 253.)

Ms. Burton returned to Mountainview Hospital on April 9, 2009 complaining of chest pain which had begun that day and was worsening.  She also reported difficulty breathing and nausea, but no vomiting.  (A.R. 213.)  Dr. Khan reported on April 10, 2009 that Ms. Burton had experienced anginal type chest pain.  There were no EKG changes and further myocardial infarction was ruled out.  Ms. Burton's chest pain subsided and she was continued on aspirin and Plavix.  Dr. Khan stated that her symptoms may be Dressler's syndrome or post MI pericarditis. (A.R. 210).

On May 13, 2009, Ms. Burton completed a "Fatigue Questionnaire" as part of her application for disability benefits.  She stated that she slept 10-12  hours a day, stayed in bed most of the time and took one or two naps a day, as needed, and that the naps were one to two hours long.  Ms. Burton stated that she never takes walks and that tiredness or weakness made it hard for her to do household chores.  She further wrote: "I don't do chores due to physical condition." (A.R. 137.)  Ms. Burton also reported that she was unable to do her own shopping, and that tiredness or weakness often made it hard to fix meals.  She also stated that it was hard for her to drive or take public transportation.  She further wrote: "I can hardly get out of bed!   unable to drive more than 20 mins."  She reported that she could walk for 0 hours, could stand for 10 minutes, and sit for 2 hours.  She stated that she could lift 10 pounds occasionally. *Id.*

On June 8, 2009, Ms. Burton was seen by Rong Wang, M.D. at the Corvallis Clinic in Oregon.  Dr. Wang's office visit note states as follows:

> . . . The patient states she moved to Las Vegas last year and she just moved back from Las Vegas to Oregon.[2]  On March 22, 2009, she

---

[2]Records from The Corvallis Clinic show that Ms. Burton was seen and treated at that clinic in July 2007 and in January, April and May 2008. (A.R. 277-284.)

3

1

2

had acute myocardial infarction and on April 9, 2009, she had a third one of myocardial infarction.  She states that the last 2 myocardial infarction were felt to be secondary to rejection of her stent, although since then, she has been doing quite well.  She quit her job there.  She finished a cardiac rehab in Las Vegas.  She denies any fever, chills, cough, chest pain, shortness of breath, palpitation, nausea, vomiting, abdominal pain, or bowel movement change, although she feels extremely tired and generalized weakness.  She denies any hematuria, hematochezia or melena.  She denies any headache, vision disturbance, localized muscle weakness or paresthesia.  (A.R. 275.)

3

4

5

6

7       Dr. Wang stated that Ms. Burton would be referred to Cardiology for further followup as

8   soon as possible.  (A.R. 275.)

9       On June 19, 2009, Ms. Burton underwent left heart catherization, left ventriculogram, and

10  selective coronary angiography at Good Samaritan Regional Medical Center in Corvallis, Oregon.

11  (A.R. 285.)  The medical history for this hospitalization states as follows:

12

13

The patient is a 46-year-old female who in March 2009 had an acute coronary syndrome/myocardial infarction while in Las Vegas, Nevada.  She underwent stent placement with 2 Promus stents implanted in her right coronary artery . . . .  She had diffuse disease in a small caliber left coronary artery.  She had subsequent myocardial perfusing imaging that did not demonstrate ischemia for recurrent chest pain.  This was in April 2009, and a 45% ejection fraction on a MUGA scan in April 2009.  She presents with 3 months of persistent and recurrent chest pains with a severe episode yesterday identical to her myocardial infarction by her description.  She is exhausted and severely dyspneic at all times.  Cardiac catherization is offered as a means to assess further coronary anatomy, left ventricular function, clinical status. . . .  (A.R. 285.)

14

15

16

17

18

19      Based on the foregoing procedures, Dr. Thomas Marker's impression and recommendation

20  was as follows:

21

22

The patient has presented with profound symptoms and profound concerns.  Her calf findings show no clear culprit lesion, though the proximal to mid left anterior descending lesion is suspect.  This hazy area may be hemodynamically significant.  I have consulted Dr. Toggart, reviewed the case and images, and he feels that it would be clinically useful to assess this lesion by hemodynamic assessment using a pressure wire.  If this pressure wire ratio is less than 0.075 then this implies hemodynamic and clinical significance and intervention with stenting would be appropriate.  Please see separate report.  (A.R. 287.)

23

24

25

26

27      A fractional flow reserve procedure using a pressure wire was performed on June 19, 2009.

28  Dr. Edward Toggart's "Diagnosis" following this procedure was as follows:

4

Mid left anterior descending artery disease with no evidence of hemodynamic significance.  No intervention required.   (A.R. 288).

Dr. Zia Khan completed a "Medical Source Statement" on or about July 22, 2009.  This is a check-list form document which provides space for comments.  Dr. Khan indicated on the form that Plaintiff has the capacity to occasionally lift less than 10 pounds, to stand and/or walk less than 2 hours in an 8 hour workday (less than sedentary), to sit less than 6 hours of an 8 hour workday, and that standard breaks and lunch period would provide sufficient relief for her need for alternate standing and sitting.  He also indicated that standard breaks and lunch periods would provide sufficient relief to allow work for 8 hours.  Dr. Khan did not provide any comments or discussion of his findings on the document. (A.R. 254-55.)

A State agency medical consultant, April Henry, M.D., completed a Physical Residual Functional Capacity Assessment form on July 28, 2009.  (A.R. 256-263.)  This was also primarily a checklist form of document.  Dr. Henry stated that Ms. Burton could lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday.  The form also asked whether:

> A.  The symptom(s) is attributable, in your judgment, to a medical determinable impairment [, and]
>
> B.  The severity or duration of the symptom(s), in your judgment, is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determined impairment(s).

Dr. Henry stated: "A & B – The severity of the allegations is not totally supported by the medical evidence."  (A.R. 261.)

The form also asked whether a medical source statement regarding the claimant's physical capacities was in the file and, if so, whether there are "medical source conclusions about the claimant's limitations or restrictions which are significantly different from your findings?"  Dr. Henry answered "yes" to both questions and stated as follows:

> Dr. Zahn (sic) has given clmt a less than sedentary RFC, but his records do not fully support this RFC.
>
> Durational to light supportable. (A.R. 262.)

Ms. Burton underwent an annual gynecological examination at the Corvallis Clinic on August 25, 2009.  The report for this examination does not discuss any symptoms or findings relative to Ms. Burton's heart condition.  The reports states that Ms. Burton was counseled regarding the importance of cardiovascular exercise and adherence to her cardiologist's plan.  The report also states: "She does currently walk."  (A.R. 269.)

Ms. Burton underwent an echocardiogram, exercise treadmill stress test, and 24 hour Holter Monitoring at Good Samaritan Regional Medical Center on December 8-9, 2009.  The echocardiogram report stated:  "1. Technically limited study[,] 2. Preserved left ventricular systolic function[,] 3. Mild mitral regurgitation[, and] 4. If clinically indicated, consider Definity."  (A.R. 298).

The exercise treadmill stress test report stated:  "The patient exercised for 5 minutes and 23 seconds, stopping secondary to severe shortness of breath and fatigue.  The patient complained of back tightness, but no chest pain.  Maximum blood pressure 170/60.  Heart rate 133, which was submaximal at 76% of predicted.  Achieved 7 METs.  Double product 222.  EKG showed no progressive ST or T wave changes.  No significant ectopy was noted.  Under "Conclusion," the report further states: "1. Submaximal exercise treadmill without evidence of ischemia[,] 2. Limited exercise tolerance." (A.R. 300.)

The 24 hour Holter Monitoring report stated:  "1. This is a 24-hour Holter recording of average technical quality with no findings of significance[,] 2. Predominant finding is normal sinus rhythm with rare ectopy.  Maximal 133, minimum 76, average 88 beats per minute[,] 3. The patient reported shortness of breath on one occasion; corresponding to the entry was normal sinus rhythm at the rate of 87 beats per minute[, and] 4. There are no pauses, arrhythmias, or heart block."  (A.R. 301.)

Ms. Burton was seen by Dr. Wang at The Corvallis Clinic on December 23, 2009.  According to Dr. Wang's note, Ms. Burton saw her cardiologist that day and was recommended to see Dr. Wang.  Ms. Burton denied any fever, chills, chest pain, worsening shortness of breath, palpitations, nausea, vomiting, abdominal pain, or bowel movement changes.  (A.R. 267.)

. . .

1      Ms. Burton again saw Dr. Wang on March 1, 2010.  She reported that she hurt her neck

2   while practicing yoga approximately two weeks earlier.  She experienced pain on the back of the

3   neck and shooting pain down the left shoulder and upper arm.  She also reported numbness and

4   tingling on her left arm to the left hand.  Ms. Burton stated that she had received four chiropractic

5   treatments and that the chiropractor recommended an MRI.  (A.R. 266.)  An MRI of Ms. Burton's

6   cervical spine was performed on March 18, 2010 and revealed a moderate-sized herniation on the

7   left at C6-7 which distorted the cord and contributed to near complete effacement of CSF about the

8   cord at that level.  Additional degenerative changes were noted, but no other significant anomaly

9   was identified.  (A.R. 289-290.).  There are no other medical reports in the record indicating

10  whether Ms. Burton received further medical treatment for her neck and arm symptoms.

11      Dr. Zia Khan examined Ms. Burton on June 2, 2010  (A.R. 307-309.)  He wrote a letter of

12  that date, stating that Ms. Burton had been under his care since April 2, 2009 and that:

13          [S]he is not to stand for any prolonged periods.  She is a patient with
            history of acute inferior wall myocardial infarction, Diabetes Mellitus
14          for 23 years, Low HDL, and Status Post Perctaneous Transluminal
            Coronary Angioplasty.  In short she has a bad heart; she is
15          symptomatic with these diagnosis listed above.

16          Due to medical history patient is unable to attend work for several
            months.  She will be followed by my office closely. (A.R. 264.)
17

18      Ms. Burton testified at the August 26, 2010 hearing that she stopped working in March

19  2009 because she had a severe heart attack.  (A.R. 40.)  The ALJ noted that Ms. Burton had some

20  stents put in and "it sounds like the recovery went pretty well."  He asked whether the stents helped

21  and Ms. Burton responded that they did help. (*Id.*)  The ALJ asked Ms. Burton what about her

22  medical condition prevented her from working.  She responded that she has "absolutely no energy."

23  Ms. Burton stated that she waited too long before going to the emergency room because she didn't

24  know she was having a heart attack and that she never fully recovered from the heart attack.  (A.R.

25  40.)  Ms. Burton also stated that she had been a diabetic for 23 years and that her feet hurt and were

26  swollen all the time.  She also stated that she had cataracts and had undergone carpal tunnel

27  surgery.  (A.R. 41.)  Ms. Burton also stated that she has a bulging disc in her neck and that she feels

28  like she is falling apart at the seams.  She stated that she used to be the first person at work and the

7

1   last one to leave, but now "I can't even take a short walk down my own street." (A.R. 41.)

2          The ALJ asked Ms. Burton how long she can walk, stand or sit.  Ms. Burton stated that she

3   "could walk for approximately a half hour and then I need to rest." (A.R. 41.)  In response to how

4   long she can stand, Ms. Burton stated: "Probably 20 minutes half hour and then I just need to sit

5   down and rest.  I'm so tired all the time." (*Id.*)  In response to how long she can sit in a chair, Ms.

6   Burton stated: "About 20 to 30 minutes and then I need to stand up." (*Id.*)  In response to a

7   question as to how much she can lift, Ms. Burton stated: "Probably a gallon of milk." (*Id.*)

8          The ALJ asked Ms. Burton to describe a typical day. (A.R. 41.)  She testified that she is

9   "up and down" all night because she cannot get comfortable.  She testified that she wakes about

10  6:00 A.M. and takes her medications, eats something so that she does not get an upset stomach, and

11  then rests for a couple of hours before getting up again.  Ms. Burton stated that she walks to the

12  kitchen, washes a few dishes and reads the newspaper.  She then walks her dog and after returning

13  home, she rests and puts ice on her neck.  Ms. Burton stated that she puts ice on her neck four times

14  a day.  She also wears a cervical collar if her neck is really bothering her. (A.R. 42.)  Ms. Burton

15  stated that she takes two naps during the day and then plans for dinner.

16         The ALJ asked Ms. Burton if she cooks dinner.  Ms. Burton answered: "Yeah.  I'm not a

17  real good cook, and I do very light, light cooking like get a bag of salad already pre-made.  I don't

18  prepare and cook.  I'm not that kind of person." (A.R. 42.)  Ms. Burton also testified that she does

19  not vacuum, sweep the floors, or do dusting.  She testified that she does "very light" laundry and "it

20  takes me all day to get through a load of laundry." (A.R. 43.)  She does not go grocery shopping.

21  Ms. Burton also testified that she does not go out to the movie theater and indicated that she

22  watches movies at home where she can stand up and stretch and walk around if she needs to. (A.R.

23  43.)  The ALJ also asked Ms. Burton whether she practices yoga.  Ms. Burton testified that she

24  tried yoga in order to lose weight, but injured her disc while doing so. (A.R. 43.)  The ALJ then

25  returned to Ms. Burton's walking.  Ms. Burton stated that she goes for walks with her dog.  She

26  stated that she walks her dog "[m]aybe a half hour.  I just walk her to the park which is six houses

27  down the street and that's all I can do." (A.R. 44.)  She stated that she does this twice a day. (*Id.*)

28  . . .

The vocational expert, Jack Dymond, testified that Ms. Burton's entire work history has been in high end jewelry sales which is considered light work. (A.R. 45.)  The ALJ asked Mr. Dymond whether a hypothetical individual who can lift 20 pounds and can complete a full eight hour work day if given the option to alternate between sitting and standing at will, could do Ms. Burton's past work in jewelry sales.  Mr. Dymond responded no. (A.R. 45.)  The ALJ then asked Mr. Dymond if such an individual could perform other jobs.  Mr. Dymond responded that Ms. Burton has transferrable skills in sales or sales related areas and that she could work as a sales associate or sales review clerk for which there are available jobs in the national and local economy. (A.R. 45).

Ms. Burton's representative asked Mr. Dymond whether someone with Ms. Burton's age, education, and work history, but who can only stand less than two hours, sit less than two hours, cannot climb stairs or ladders, kneel, crouch, can only do occasional stooping, and cannot be around moving machinery could perform any work. (A.R. 46.)  Mr. Dymond stated: "No.  If the (sic) can only sit for two hours the total time, they wouldn't be able to do.  They'd be doing less than sedentary work and there is nothing available that I have for that." (A.R. 46)  Mr. Dymond also testified that an individual who has to take two one-hour naps during a workday because of fatigue would not be able to do any work because most employers have a half hour to an hour lunch break and two 15 minute breaks. (A.R. 46-47.)

### C.   Administrative Law Judge's September 20, 2010 Decision

The Administrative Law Judge (ALJ) issued his decision on September 20, 2010.  The ALJ found that Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2010. (A.R. 18.)  The ALJ therefore held that Plaintiff was required to establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. (*Id.*)

To determine whether Plaintiff was disabled, the ALJ used the five-step sequential evaluation process established by the Social Security Administration.  20 CFR 404.1520(a).  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity ("SGA") since March 22, 2009. (A.R. 20.)  Second, the ALJ found that Plaintiff had the following severe impairments:

9

1    status post myocardial infarction and diabetes mellitus. (*Id.*)  Third, the ALJ found that neither of

2    Plaintiff's impairments caused more than minimal functional limitations.  (*Id.*)  The ALJ therefore

3    found that Plaintiff did not have an impairment or combination of impairments that met or

4    medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.*)

5           The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform

6    the full range of light work, except that Plaintiff must have the option to alternate between sitting

7    and standing at will to complete a full, eight hour work day.  (A.R. 20.)  The ALJ found that

8    Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged

9    symptoms, but that her statements and testimony regarding the intensity, persistence and limiting

10   effects of her symptoms were not credible to the extent that they were inconsistent with the RFC

11   assessment. (A.R. 21.)

12          Because Plaintiff's symptoms suggested a greater level of severity than could be shown by

13   the  medical evidence, the ALJ considered the medical records and medical opinion evidence in

14   assessing the credibility of the Plaintiff's statements.  The ALJ noted that the myocardial infarction

15   in March, 2009 required the placement of two stents in Ms. Burton's right coronary artery; that she

16   did very well following surgery other than some instances of chest pain; and that she had a

17   generally unremarkable physical examination in early April 2009.  The ALJ also noted that follow

18   up diagnostic studies showed normal left ventricular function, heart chambers and valves with only

19   mild mitral valve regurgitation and no evidence of accute cardiopulmonary disease.  A peripheral

20   vascular arterial evaluation in May 2009 revealed normal triphasic flow in the lower extremities and

21   normal ankle-brachial index and the claimant had an ejection fraction of 45%.  (A.R. 22.)  The ALJ

22   further noted that "[i]n early June 2009, the claimant said she had been doing well since April,

23   denying chest pain, shortness of breath, palpitation, and nausea but reported fatigue and weakness."

24   (*Id.*)  He further noted that "[j]ust days later, the claimant complained of persistent chest pain,

25   fatigue and shortness of breath and cardiac catherization showed a visually estimated ejection

26   fraction of 45%.  A follow up hemodynamic assessment showed mild left anterior descending

27   disease with no evidence of hemodynamic significance.  No intervention was indicated (Ex. 8F)."

28   (A.R. 22.)  The ALJ also discussed Ms. Burton's subsequent symptoms of tachycardia and

10

shortness of breath in December 2009 and the results of the tests that were performed at that time. (*Id.*)

The ALJ also considered Plaintiff's diabetes mellitus, finding that it is generally well-controlled with medication. (A.R. 22.)  He also considered Plaintiff's complaints of neck pain due to an injury while practicing yoga in late 2009. (A.R. 22.)  Plaintiff's MRI showed mild degenerative changes and a moderate herniation on the left at C6-7 distorting the cord.

In concluding that Ms. Burton was able to perform light work,[3] the ALJ stated as follows:

> In July 2009, Dr. Zia Kahn (sic), M.D. opined that the claimant had the residual functional capacity to lift less than 10 pounds, stand and walk less than two hours, sit less than six hours and that she has multiple nonexertional limitations.  In June 2010, after seeing the claimant once after not treating her for almost a year, Dr. Kahn (sic) indicated that the claimant cannot stand for prolonged periods and cannot work for several months. (Exs. 5F; 7F).  Although a treating source, Dr. Kahn's (sic) opinion is inconsistent with the treatment record as a whole, and in particular with the claimant's June 2009 report that she is doing quite well.  (Ex. 8F).  Furthermore, her opinion appears to be advocative and relies on the claimant's subjective report of symptoms and limitations which are not entirely supported by the objective evidence of record.  Dr. Kahn's (sic) opinion is afforded limited weight.  (A.R. 23.)
>
> In July 2009, the State agency consultant opined that the claimant can perform light work with postural and environmental limitations (Ex. 6F).  The undersigned affords her opinion that the claimant can perform light work great weight because it is consistent with the record.  The remainder of her assessment is afforded little weight as the claimant's level of activity indicates that she has different limitations.
>
> The claimant's May 2009 report that she can barely get out of bed, cannot walk for any amount of time, can stand for only 10 minutes and sit for two hours is contradicted by her testimony and the record. (Ex. 4E).  Since the alleged onset date and time she completed the report, the claimant has traveled from Las Vegas to Oregon and back, an activity that requires prolonged sitting, standing, and walking as well as energy.  Despite her testimony that her neck requires icing four times a day, she is able to wash dishes and prepare simple meals.

---

[3] "Light work: Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 CFR 404.1567(b).

> She also testified that she walks her dog twice a day for 30 minutes, indicating she has some stamina.  The claimant has been stable since her stent placement, has been prescribed only conservative treatment and admitted that she was feeling better in June 2009.  (Ex. 8F).
>
> Based on the foregoing, and after observing the claimant at the hearing and listening to her testimony, the undersigned finds that the claimant can lift 20 pounds and can complete a full eight hour workday, if given the option to alternate between sitting and standing at will.  (A.R. 23.)

Based on Mr. Dymond's vocational testimony, the ALJ found that Ms. Burton was unable to perform her past work in jewelry sales.  He found, however, she had sales related skills that are transferrable to other sales positions and that she could perform work as a telephone sales associate and sales review clerk for which jobs are available in the national and local economy. (A.R. 24.) The ALJ therefore concluded that Plaintiff was not disabled from March 22, 2009 through the date of the decision.  (A.R. 25.)

## DISCUSSION

### I.    Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not

substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin*, 654 F.2d at 635 (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)    he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If the claimant establishes an

13

1   inability to perform his or her prior work, the burden shifts to the Commissioner to show that the
2   claimant can perform other substantial gainful work that exists in the national economy. *Batson*,
3   157 F.3d at 721.

4       **III.    Analysis of the Plaintiff's Alleged Disability**

5       Social Security disability claims are evaluated under a five-step sequential evaluation
6   procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir.
7   2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180
8   F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point
9   during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). Under the
10  first step, the Secretary determines whether a claimant is currently engaged in substantial gainful
11  activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b).
12  Second, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If
13  the impairment is not severe, the claimant is not considered disabled. *Id*. § 404.152(c). Third, the
14  claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P,
15  App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed
16  impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is
17  whether the claimant can perform past relevant work. *Id*. § 416.920(e). If the claimant can engage
18  in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform
19  past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating
20  that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f). If the Secretary cannot
21  meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

22      Plaintiff challenges several aspects of the ALJ's decision. The issues before the Court are
23  (1) whether the ALJ failed to make complete findings at step 2 as to the severity of all of Plaintiff's
24  medically determinable impairments; (2) whether the ALJ erred in rejecting the treating physician's
25  opinion regarding Plaintiff's residual functional capacity in favor of the opinion of the State agency
26  consultant; (3) whether the ALJ's decision to reject Plaintiff's subjective symptoms testimony was
27  supported by substantial evidence; and (4) whether the ALJ erred in finding Plaintiff has
28  transferable skills.

**A.      The ALJ Did not Error at Step 2 of the Analysis.**

Ms. Burton argues that the ALJ's findings at step 2 are incomplete because the ALJ never made a finding as to the severity of Ms. Burton's herniated cervical disc or degenerative disk disease.  Ms. Burton argues that there was evidence in the record which showed that she suffered from neck pain and upper extremity symptoms caused by a herniated cervical disc or degenerative disc disease which was confirmed by an MRI study.  She argues that the ALJ's failure to list this impairment at step 2 tainted his subsequent findings at step 3, which in turn affected the findings at steps 4 and 5 of the sequential analysis.  Plaintiff therefore asks the Court to remand this case for proper findings at step 2 of the analysis.

"An impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The severity inquiry is "a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citations omitted).  An impairment can be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id.* (citations omitted).  Even if the ALJ errs in neglecting to list an impairment as "severe" at step 2, such an error is harmless if the ALJ considers the limitations posed by the impairment at step 4.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  The ALJ discussed and evaluated Plaintiff's cervical disc herniation/degenerative disc disease, and her neck pain, upper arm numbness and tingling at steps 3 and 4 of the sequential analysis. (A.R. 21, 22.) The Court therefore finds that any error by the ALJ in failing to list Ms. Burton's cervical spine condition as a severe impairment at step 2 was harmless.

**B.      The ALJ Erred in His Determination Regarding Plaintiff's Credibility and in Rejecting the Opinions of Plaintiff's Treating Physician, Dr. Khan.**

Ms. Burton argues that the ALJ erred by giving only limited weight to the opinion of her treating physician, Dr. Zia Khan, and by giving great weight to the functional capacity assessment of the State agency medical consultant, Dr. April Henry.  "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir.

2001).   If the treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," it should be afforded more weight.  20 CFR 416.927(d)(2).  The ALJ need not accept an opinion of a physician - even a treating physician - if it is conclusory and brief and is unsupported by clinical findings. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  If the treating physician's opinion is not contradicted by another physician, then his or her opinion may be rejected only for clear and convincing reasons.  If the treating physician's opinion is contradicted by another physician, then the treating physician's opinion can only be rejected by the Secretary for specific and legitimate reasons, supported by substantial evidence in the record for so doing.  *Lester v. Charter*, 81 F.3d 821, 831 (9th Cir. 1996).

Neither Dr. Khan nor Dr. Henry provided detailed explanations for their July 2009 assessments of Ms. Burton's residual functional capacity.  Each physician completed a check list form.  The ALJ was correct in finding that Dr. Khan's June 2, 2010 opinion is "advocative" in the sense that his statements that Ms. Burton "is not to stand for any prolonged periods" and is "unable to attend work for several months" were conclusory.  (A.R. 264.)  There is, however, no medical opinion in the record which adequately explains why Dr. Khan's July 2009 assessment and opinion regarding disability are incorrect.  Dr. Henry's 2009 assessment generally asserts that "[t]he severity of the allegations is not totally supported by the medical evidence" and that "Dr. Zahn (sic) has given clmt a less than sedentary RFC, but his records do not fully support this RFC."  (A.R. 261-262.)  Dr. Khan was Ms. Burton's treating physician.  He performed the surgery following her myocardial infarction on March 22, 2009.  He also saw and/or examined Ms. Burton in follow-up visits and hospitalization in April and early May 2009.  Dr. Khan again saw and examined her in June 2010. There is no evidence that Dr. Henry examined Ms. Burton.  Her opinion appears to be based entirely on the medical records that were made available to her, but it is unclear what records she reviewed. The record also contains no information regarding her area of specialization or practice.

In rejecting Dr. Khan's opinion, the ALJ noted, in particular, that his opinion was inconsistent with the claimant's June 8, 2009 report to Dr. Wang "that she is doing quite well." (A.R. 23.)  The ALJ also stated that Dr. Khan had not seen Ms. Burton for more than a year prior to

16

examining her on June 2, 2010. (A.R. 23.)  The ALJ also found that Ms. Burton's May 2009 report

regarding her fatigue and physical limitations was contradicted by her later testimony and the record

as a whole.  In so finding, the ALJ also relied, in part, on Dr. Wang's June 8, 2009 office note, which

he characterized as containing an admission by Ms. Burton "that she was feeling better."  (*Id.*)

The ALJ is responsible for determining credibility and resolving conflicts in medical

testimony.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  However, the ALJ's credibility

findings must be supported by specific, cogent reasons.  *See Rahad v. Sullivan*, 903 F.2d 1229, 1231

(9th Cir. 1990); *see also Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir. 1988).  The ALJ must

identify what testimony is not credible and what evidence undermines the claimant's complaints.

*Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *see also Dodrill v. Shalala*, 12 F.2d 915, 918 (9th

Cir. 1993).  In  *Molina v. Astrue*, 674 F.3d 1104, 1112-3 (9th Cir. 2011), the court further discusses

the credibility assessment as follows:

> In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis.  *Vasquez v. Astrue,* 572 F. 3d 586, 591 ( 9th Cir. 2009).  First, the ALJ must determine whether there is "'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* (quoting *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir.2007)).  If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "'specific, clear and convincing reasons'" in order to reject the claimant's testimony about the severity of the symptoms.  *Id.* (quoting *Lingenfelter,* 504 F.3d at 1036).  At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989).  In evaluating the claimant's testimony, the ALJ may use "'ordinary techniques of credibility evaluation.'"  *Turner,* 613 F.3d at 1224 n. 3 (quoting *Smolen,* 80 F.3d at 1284).  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment,'" *Tommasetti,* 533 F.3d at 1039 (quoting *Smolen,* 80 F.3d at 1284); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter,* 504 F.3d at 1040.  While a claimant need not "'vegetate in a dark room'" in order to be eligible for benefits, *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987) (quoting *Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981)), the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir.1999); *Fair,*

885 F.2d at 603.  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *See Turner,* 613 F.3d at 1225; *Valentine,* 574 F.3d at 693.

Ms. Burton met the first prong of the credibility analysis because the ALJ stated that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (A.R. 21.)  In *Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009), the court stated that "[t]o support a lack of credibility finding, the ALJ was required to 'point to specific findings in the record which demonstrate that [Vasquez] is in less pain than she claims.'" (citation omitted.)   Here, the issues are whether Ms. Burton suffered from less pain, fatigue or shortness of breath than she claims.  The Court finds that the ALJ's reasons for rejecting Ms. Burton's credibility under the second step of the analysis are not clear and convincing reasons to support that determination.

The ALJ's reliance on Dr. Wang's June 8, 2009 office visit note to reject Ms. Burton's credibility and Dr. Khan's opinion is not justified by a fair reading of that note or the other parts of the medical record.  Dr. Wang's note stated in pertinent part as follows:

On March 22, 2009, she had acute myocardial infarction and on April 9, 2009, she had a third one of myocardial infarction.  She states that the last 2 myocardial infarction were felt to be secondary to rejection of her stent, although since then, she has been doing quite well. . . . (A.R. 275)

As the above passage indicates, the statement that she "has been doing quite well" was made in context of Ms. Burton's reported history of recent myocardial infarctions.[4]  Only a few lines later in the same paragraph, Dr. Wang states that Ms. Burton reported that "she feels extremely tired and [has] generalized weakness."  The ALJ noted the reference to "fatigue and weakness" on page five (A.R. 22) of his decision, but omitted reference to the word "extremely."  The ALJ did not discuss this latter statement when he used the "doing quite well" statement to discount Dr. Khan's opinion and Ms. Burton's credibility.  (A.R. 23.)  The ALJ also failed to note that Dr. Wang stated that "[w]e will refer her to Cardiology for followup as soon as possible."  (A.R. 275.)  The ALJ also

---

[4]The medical records of Mountainview Hospital and Dr. Khan do not support Ms. Burton's apparent statement to Dr. Wang that she suffered myocardial infarctions in April 2009, after the initial infarction on March 22, 2009.  She did, however, complain of chest pain and difficult breathing on April 9, 2009.  (A.R. 213.)

1   disregarded the June 19, 2009 report from the Good Samaritan Medical Center which stated that Ms.

2   Burton "presents with 3 months of persistent and recurrent chest pains with a severe episode

3   yesterday identical to her myocardial infarction by her description.  She is exhausted and severely

4   dyspneic [short of breath] at all times."  (A.R. 285.)  Ms. Burton also subsequently reported severe

5   shortness of breath and fatigue during the exercise treadmill stress test on December 8, 2009.  (A.R.

6   300.)

7        The ALJ's interpretation of the "doing quite well" statement to discount Ms. Burton's

8   complaints of fatigue and weakness is contrary to the other and more specific statements about her

9   physical condition during the same medical visit.  The ALJ's interpretation is also inconsistent with

10   Ms. Burton's subsequent and fairly consistent complaints of recurrent chest pain, exhaustion and

11   shortness of breath.  Dr. Wang's June 8, 2009 office visit note does not provide a legitimate or

12   convincing reason for rejecting the credibility of Ms. Burton's hearing testimony regarding her

13   physical symptoms and limitations or Dr. Khan's opinions regarding her residual functional capacity

14   and inability to work.

15        The ALJ also stated that "[s]ince the alleged onset date and the time she completed the [May

16   2009] report, the claimant has traveled from Las Vegas to Oregon and back, an activity that requires

17   prolonged sitting, standing and walking as well as energy."  (A.R. 23.)  There is no information in

18   the record, however, regarding Ms. Burton's travel between Las Vegas and Oregon.  The ALJ did not

19   question Ms. Burton about this travel during the August 26, 2010 hearing.  It is therefore unknown

20   whether she traveled by airplane or automobile, or what, if any, arrangements or accommodations

21   were made to deal with her alleged physical limitations during travel.  It is unknown, for example,

22   how long it took Ms. Burton to travel between Las Vegas and Oregon if she went by automobile,

23   whether she did any driving, or how frequently she stopped along the way to rest, stretch or walk

24   around.  There is also no information whether Ms. Burton experienced any increase in pain, stiffness

25   or fatigue as a result of this travel.  The inference drawn by the ALJ on the basis of Ms. Burton's

26   travel between Las Vegas and Oregon is therefore speculative and does not provide a legitimate or

27   convincing reason to discount her credibility.

28        The ALJ also discounted the severity of Ms. Burton's limitations based on her hearing

testimony that she is able to perform some physical activities.  The ALJ noted that Ms. Burton is able to wash dishes, prepare simple meals, and walk her dog two times a day for thirty minutes.  (A.R. 23).  Ms. Burton testified that she does only very light cooking.  She does not vacuum or sweep floors, does not do grocery shopping, and does only "very light" laundry.  Ms. Burton also testified that she walks about six houses from her residence to a park and that it takes her thirty minutes to do this walk.  She also testified that she rests and takes naps throughout the day.  (A.R. 41-44.)  The ALJ is entitled to draw reasonable inferences from the claimant's testimony, even if those inferences are contrary to the claimant's assertions of disability.  Here, however, the ALJ emphasized the physical activities that Ms. Burton testified she can perform, without discussing or assessing Ms. Burton's testimony regarding the limited nature of those activities or the other activities of daily living that she testified she is unable to perform.  The ALJ's incomplete and one-sided description of Ms. Burton's physical activities does not provide a legitimate or convincing reason to discount her credibility.

The medical treatment records show that Ms. Burton complained of ongoing symptoms of chest pain, fatigue, weakness and shortness of breath after her myocardial infarction on March 22, 2009 and the placement of stents in her right coronary artery.  The cardiology physicians who examined Ms. Burton and conducted further testing, including Dr. Khan in Las Vegas and Drs. Marker and Toggert in Corvallis, Oregon, did not recommend any further surgical treatment for her coronary disease.  Their reports do not indicate, however, that Ms. Burton's subjective symptoms of chest pain, fatigue/exhaustion, or shortness of breath were inconsistent with or out of proportion to the objective medical finding that she suffers from coronary artery disease.

The Court, therefore, concludes that the ALJ's September 20, 2010 Decision does not provide legitimate reasons, supported by substantial evidence in the record, to reject Dr. Khan's assessment of Ms. Burton's functional capacity and to instead adopt Dr. Henry's assessment that Ms. Burton is able to perform light work with the option to alternate between sitting and standing at will.  The Court also concludes that the ALJ did not provide specific, clear and *convincing* reasons for rejecting the credibility of Ms. Burton's testimony regarding the severity of her symptoms or limitations.

20

**C.**     **The ALJ Did Not Err in Finding That Plaintiff had Transferrable Job Skills.**

The undersigned addresses Plaintiff's argument that the ALJ also erred at step 5 of the sequential analysis, in the event the District Court upholds the ALJ's decision at step 4 of the analysis.

"Once a claimant has established that he or she suffers from a severe impairment that prevents the claimant from doing any work he or she has done in the past, the claimant has made a prima facie showing of disability." *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999).  The burden then shifts to the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience.  20 CFR § 404.1560(b)(3).  The Commissioner can meet this burden in two ways: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. *See Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 577–78 (Pregerson, J., concurring) (9th Cir. 1988).  In determining whether an individual has any transferable skills, the focus is on the individual's past relevant work.  "Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semi-skilled jobs."  S.S.R. 82-4; *see* 20 C.F.R §§ 404.1568(d)(1), 416.968(d)(1).  When the ALJ makes a finding of fact that a claimant has transferable skills, "the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision." *Id.*; *see Bray v. Commissioner of Social Security*, 554 F.3d 1219, 1226 (9th Cir. 2009) (requiring remand due to ALJ's failure to make any findings regarding the transferability of acquired work skills).

Plaintiff argues that the Commissioner did not meet his burden at step 5 of the analysis.  Specifically, Plaintiff argues that the vocational expert never identified the precise skills that are transferrable, nor did he describe how those skills could be applied to each of the jobs he identified.  After the vocational expert, Mr. Dymond, testified that Ms. Burton would not be able to perform her past work in high end jewelry sales, the ALJ then asked him if there are other jobs that an individual with her residual functional capacity, education and employment history could preform.  Mr. Dymond

21

responded:

> Yes, Your Honor, there are. She does have transferrable skills in sales or sales related areas. A Sales Associate using telephone which is sedentary, SPV3, DOT 299.357-014. There are 2,000 in Las Vegas and 321,000 nationally. For a Sales Review Clerk, this is sedentary, SPV4, DOT 209.687-018. There are 1,100 positions in Nevada and 239,000 nationally.

(A.R. 45-6.)

Plaintiff testified that all her past relevant work "were sales positions," (A.R. 40) and the vocational expert testified that Plaintiff had sales and sales related skills that are transferrable. The ALJ relied on this testimony and found that Plaintiff has "multiple sales and sales related skills" that are transferrable to other sales related positions. (A.R. 23-24.) *See Prince v. Apfel*, 1998 WL 317525 at *3 (10th Cir. 1998) ("The only evidence in the record relevant to the transferability of claimant's skills was the vocational expert's testimony, clearly a proper evidentiary source on this topic."). The Court therefore concludes that the ALJ did not err in his Step 5 analysis.

### D.   Whether This Case Should Be Remanded for An Award of Benefits or for Further Administrative Proceedings to Determine Whether Plaintiff is Disabled.

There is a split of authority in the Ninth Circuit in regard to whether an application for social security disability benefits should be remanded for an award of benefits or further administrative proceedings when the court determines that the ALJ failed to provide legally sufficient reasons for rejecting the claimant's testimony and her treating physician's opinions.

In *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004), the court stated as follows:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. *See Harman,* 211 F.3d at 1178. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. *See Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir.1996); *Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1399 (9th Cir.1988). More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Harman,* 211 F.3d at 1178; *see also McCartey v. Massanari,* 298 F.3d 1072, 1076-77 (9th Cir.2002); *Smolen,* 80 F.3d at 12920.

22

1   Where the *Harman* test is met, we will not remand solely to allow the
    ALJ to make specific findings regarding excessive pain testimony.
2   Rather, we take the relevant testimony to be established as true and
    remand for an award of benefits. *Varney,* 859 F.2d at 1401; *see also*
3   *Reddick v. Chater,* 157 F.3d 715, 728 (9th Cir.1998) (quoting *Varney*);
    *Lester,* 81 F.3d at 834 (same); *Swenson v. Sullivan,* 876 F.2d 683, 689
4   (9th Cir.1989) (same); *but cf. Connett v. Barnhart,* 340 F.3d 871, 876
    (9th Cir.2003) (holding that the court has flexibility in crediting
5   petitioner's testimony if substantial questions remain as to her
    credibility and other issues must be resolved before a determination of
6   disability can be made).

7   The court in *Benecke* held the ALJ's rejection of the claimant's testimony regarding the

8   severity of her fibromyalgia symptoms and the opinions of her treating physicians regarding her

9   physical limitations was in error.  Because the vocational expert testimony established that the

10  claimant was unable to perform a sedentary job based on her credited symptoms and physical

11  limitations, the court held that remand for administrative proceedings would serve no useful purpose

12  and was unwarranted.  *Id.* 379 F.3d at 596.

13  In *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), however, another Ninth Circuit

14  panel stated as follows:

15          . . . [W]e are not convinced that the "crediting as true" doctrine is
            mandatory in the Ninth Circuit.  Despite the seemingly compulsory
16          language in *McCartey* and *Swenson,* there are other Ninth Circuit cases
            in which we have remanded solely to allow an ALJ to make specific
17          credibility findings.  In *Dodrill,* for example, our court specifically
            remanded for the ALJ to "articulat[e] specific findings for rejecting
18          [the claimant's] pain testimony and the testimony of lay witnesses." 12
            F.3d at 919.  In *Nguyen v. Chater,* where the ALJ failed to consider the
19          claimant's testimony with regard to his asthma, our court remanded
            with the specific proviso that "[i]t is not our intent ... to preclude the
20          ALJ from reopening the hearing to receive additional evidence,"
            including, presumably, evidence regarding the claimant's credibility.
21          100 F.3d 1462, 1466-67 (9th Cir.1996).  *See also Byrnes v. Shalala,* 60
            F.3d 639, 642 (9th Cir.1995) ("We therefore remand this case to the
22          ALJ for further findings evaluating the credibility of [the claimant's]
            subjective complaints....").

23

24  The court in *Connett* upheld the ALJ's finding that the claimant's testimony regarding the

25  degree and nature of her neck, shoulder and back pain was not supported by the record.  The court

26  also upheld the ALJ's rejection of the opinion of one of the claimant's treating physicians that her

27  conditions were disabling.  The court, however, reversed the ALJ's rejection of the claimant's

28  testimony that she suffered from severe colitis and migraine headaches because the ALJ failed to set

23

forth specific and convincing reasons for rejecting that testimony.  The court noted that while the district court pointed to many discrepancies between the medicals record and the claimant's account of her migraine and colitis symptoms, the ALJ did not discuss these points in his decision.  The court noted that it is constrained to review the reasons that ALJ asserts for his decision.  *Id.* 340 F.3d at 874.  The court remanded the case for further determination regarding the claimant's migraine and colitis symptoms and the alleged limitations resulting therefrom.  The court also stated that the ALJ was free to reconsider his decision with regard to the claimant's migraines and colitis, including her credibility on those complaints.  *Id.* at 876.

An arguable distinction between *Benecke* and *Connett* is that in *Benecke,* there was no basis in the record to support the ALJ's rejection of the claimant's testimony regarding the severity of her fibromyalgia symptoms, whereas in *Connett* the record arguably contained evidence that would have supported the ALJ's decision if he had cited that evidence in support of his decision.  In any event, the conflict in the Ninth Circuit case law on this issue has not yet been resolved.  *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009).

In *Esposito v. Astrue*, 2012 WL 1027601, *8 (E.D.Cal. 2012), the district court commented on the Ninth Circuit conflict as follows:

> District courts are thus commanded by the *Benecke* line of cases to remand for payment of benefits if the three-part test discussed above is met, but simultaneously instructed by *Connett* that they need not remand for payment of benefits under the same circumstances.  As the *Benecke* line of authority appears to require this court to remand for payment of benefits if the precedent conditions are met, and the *Connett* line of cases merely permits, but does not require, this court to remand for further proceedings in the same circumstances, this court seems bound to apply the *Benecke* line of cases. Indeed, *Connett* does not explain how this court should decide whether to apply the credit-as-true rule, but merely suggests that we have flexibility in choosing which claimants receive benefits on remand when the same precedent conditions are met. Such an approach invites arbitrary decision-making and impermissible re-weighing of the medical evidence by this court. Thus, until the Ninth Circuit resolves this issue en banc, this court will follow the *Benecke* test.

*See also Wilson v. Astrue*, 2011 WL 609801, *11 (D.Or. 2011) (noting that decisions after *Connett* decline to endorse that case's flexible approach and instead frame the credit-as-true rule as encouraged if not altogether mandatory).

1  In this case, the evidence in the record regarding the severity of Ms. Burton's symptoms and

2  physical limitations is, perhaps, not as compelling as that in *Benecke*.  The severity of Ms. Burton's

3  symptoms was, however, supported by the assessment and opinion of her treating physician, Dr.

4  Khan.  The ALJ's reasons for rejecting the credibility of Ms. Burton's testimony and the opinion of

5  Dr. Khan were not specific, legitimate or convincing.  Accordingly, Ms. Burton's statement and

6  testimony regarding the extent of her limitations and Dr. Khan's assessment and opinion regarding

7  the same should be credited as true.  The vocational expert testified that an individual with Ms.

8  Burton's physical limitations would "be doing less than sedentary work and there is nothing

9  available that I have for that." (A.R. 46.)  He also testified that an individual who has to take two

10  one-hour naps during a workday because of fatigue would not be able to do any work.  (A.R. 46-47.)

11  The Commissioner therefore cannot meet his burden at step 5 of the sequential process to show that

12  there are other jobs in the national economy that Ms. Burton is capable of performing based on her

13  physical limitations as credited.  Because there are no outstanding issues to be resolved upon

14  remand, this case should be remanded for an award of benefits, rather than for further hearing on the

15  issue of disability.

## CONCLUSION

17  Having reviewed, considered and weighed both the evidence that supports and the evidence

18  that detracts from the ALJ's conclusion, the Court finds the ALJ's decision is not supported by

19  substantial evidence, and that the ALJ erred as a matter of law in concluding that Plaintiff is not

20  disabled.  Accordingly,

## RECOMMENDATION

22  **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (#12) be **granted**

23  and that this case be remanded to the Commissioner of Social Security for an award of disability

24  benefits.

## NOTICE

26  Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

27  writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held

28  that the courts of appeal may determine that an appeal has been waived due to the failure to file

25

objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 1st day of November, 2012.


_____
GEORGE FOLEY, JR.
United States Magistrate Judge

26